AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
3/11/22
CENTRAL DISTRICT OF CALIFORNIA
BY: nne DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
3/11/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: vam DEPTUTY

United States of America

v.

JESUS ERIK PULIDO,

Defendant(s)

Case No. 2:22-mj-01007 -DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between the date(s) of January 4, 2022, and January 13, 2022, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2117 | Breaking or Entering Carrier Facilities |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Paul A. Sanchez*
*Complainant's signature*

Paul A. Sanchez, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: March 11, 2022, 4:07 p.m.

*Judge's signature*

City and state: Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lynda Lao (x7167)

# AFFIDAVIT

I, Paul A. Sanchez, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against **JESUS ERIK PULIDO** ("**PULIDO**") for a violation of Title 18, United States Code, Section 2117 (breaking or entering carrier facilities).

2. This affidavit is also made in support of an application for a warrant to search one digital device (the "**SUBJECT DEVICE**"), in the custody of Burlington Northern Santa Fe ("BNSF") Police Department ("BNSF PD"), in Los Angeles, California, as described more fully in Attachment A:

a. Blue Motorola cellular telephone ("**SUBJECT DEVICE**").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 2117 (breaking or entering carrier facilities), 371 (conspiracy), 659 (theft of goods from interstate transport), 1991 (entering a train to commit a crime), 2116 (entering, by violence, into a railway carrying mail), 2314 (transportation of stolen goods in interstate commerce), and 2315 (sale, possession, or receipt of stolen goods from interstate commerce) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF PAUL A. SANCHEZ

5. I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18 of the United States Code. I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

6. I have been employed as a SA with the FBI since June 2015. I am presently assigned to the Los Angeles Field Office, Long Beach Resident Agency, where I am responsible for investigating violent crimes, gangs, and other violations of federal statutes. I received formal training to become an agent at the FBI Academy in Quantico, Virginia, which included training on organized criminal organizations, money laundering, bank robbery offenses, violent street gangs, and violent crimes. In addition, I have received both formal and informal training

from the FBI and other institutions regarding computer-related investigations and computer technology.

7. Before joining the FBI, I received a law degree from Florida State University College of Law in 2008. From 2008 until 2011, I served on active duty with the United States Air Force's Judge Advocate General's Corps, serving as an Assistant Staff Judge Advocate. My duties included legal assistance, labor law, medical law, administrative law, command directed investigations, and military justice. In 2011, I transitioned from active duty to the military reserves. I am currently a Lieutenant Commander in the United States Navy Reserve Judge Advocate General's Corps. From 2011 to 2014, I worked as an Assistant State Attorney in Sanford, Florida. My responsibilities included prosecuting both misdemeanor and felony offenses, ranging from petty theft, driving under the influence, and battery, to domestic violence, arson, burglary, and robbery. From November 2014 to January 2015, I worked as an Assistant School Board Attorney for Seminole County Public Schools.

8. During my law enforcement career, I have employed, or been involved in investigations that employed, various investigative techniques, including witness interviews, and collection and review of both physical and digital evidence. Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods employed by individuals involved in organized criminal organizations, including organized burglary teams.

## III. SUMMARY OF PROBABLE CAUSE

9. Between March and December 2021, a series of thefts from shipping containers traveling by trains operated by the BNSF Railway Company occurred, each committed in a generally similar manner and targeting similar stolen property. As described further below, law enforcement has identified **JESUS ERIK PULIDO** as committing at least one such burglary.

10. Between January 7, 2022, and January 13, 2022, several instances of damage to train air hoses and thefts from shipping containers traveling by BNSF occurred. The January 2022 incidents were committed in a similar manner. Law enforcement identified the person responsible for at least one of the January 2022 incidents as **PULIDO.** On January 14, 2022, **PULIDO** was arrested by BNSF PD and upon his arrest BNSF PD seized the **SUBJECT DEVICE.** Further, during a post-arrest and Mirandized interview, **PULIDO** admitted to being responsible for the January 2022 incidents, both the cutting of the train's air hoses and the theft of property from BNSF cargo containers.

## IV. STATEMENT OF PROBABLE CAUSE

11. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Initial BNSF Shipping Container Thefts

12. Between March and December 2021, a series of thefts from shipping containers traveling by trains operated by BNSF occurred, each committed in a generally similar manner and of similar stolen property. FBI is working with BNSF authorities on

this investigation and may have identified several potential subjects involved in these crimes.

**B. January 7, 2022, Air Hose Cutting and Theft from BNSF Container in Vernon, California**

13. As part of the joint investigative efforts between BNSF PD and the FBI, BNSF PD provided a report describing a theft that occurred on January 7, 2022. Per the BNSF PD report, on or about January 7, 2022, BNSF PD received notification that an unidentified male was breaking into shipping containers on a train, identified as S-LPCSCO-1-04L, with an electric saw (hereafter referred to as "the January 7 Burglary"). The train's conductor reported that the train's air hose was cut, forcing the train into emergency mode and the train was forced to stop. Law enforcement found four separate containers with open doors. One of the open containers was OOCU 644352 which contained grain. I reviewed the shipping details provided by BNSF for OOCU 644352 which showed the grain in the container was being shipped from Chicago, Illinois to Long Beach, California. Boneless pork shoulder from another of the opened containers, OERU 418449, was located on the ground near a homeless encampment located near the BNSF railway.

14. A surveillance video from January 7, 2022, recorded the then-unknown male using an electric saw to cut the seal of the four shipping containers. During my review of the surveillance video, I observed the unknown male move around the shipping containers with what appeared to be a light attached to a small saw. The unknown male then repeatedly approached the

container, looked around the area surrounding the container, and ultimately cut the security device from the container with a small saw. Based on my training and experience, I believe the unknown male's conduct was intended to determine if security was responding to the unknown male's presence and if there was time to unseal the containers undetected.

**C. Other Air Hose Cutting and Thefts from BNSF Containers in Los Angeles, California**

15. According to BNSF PD reporting, on or about January 9, 2022, BNSF PD received a report that a BNSF train, identified as S-LBTLPC1-09K, was forced to stop in emergency mode after one of its air hoses had been cut and two unknown persons were burglarizing one of the train's containers near the area of the cut air hose (hereafter referred to as "the January 9 Burglary"). When law enforcement arrived at the scene, the two unknown persons were gone, and a train container was open. The open container contained Midea 24' dishwashers. BNSF PD found that approximately nine boxes were missing from the load. Further investigation found five boxes of Midea 24' dishwashers in an area near the railway tracks.

16. According to BNSF PD reporting, there were additional incidents of train air hoses being cut, sometimes associated with a train container theft. On or about January 4, 2022, BNSF PD documented an incident where a train was forced to stop due to a cut air hose. There was no noted container theft, but investigators noted the cuts to the air hose appeared to have been made with a reciprocating saw. On or about January 10,

2022, BNSF PD documented an incident where a train was forced into an emergency stop due to cut air hoses in the area of Buena Park, California. Inspection of the cut air hoses indicated the cuts were made by a reciprocating saw. On or about January 13, 2022, BNSF PD, while conducting investigative operations related to the previous air hose cutting and theft incidents, observed a train with the doors to a container open near the rear of the train. Upon inspection by BNSF PD, it was determined that approximately 20 boxes of Hallmark greeting cards were missing from the shipment container.

**D. Arrest and Interview of JESUS ERIK PULIDO**

17. BNSF reported that on or about January 11, 2022, law enforcement was conducing physical surveillance in the area in Los Angeles, California where the January 2022 incidents occurred. During that surveillance, BNSF PD observed an adult Hispanic male who appeared to be the same male captured on surveillance recordings of the January 7 Burglary.

18. According to BNSF PD reporting, on or about January 14, 2022, BNSF PD conducted an investigative operation related to the numerous air hose cutting and container theft incidents. The investigative operation was conducted in the same area as the physical surveillance from January 11, 2022. At approximately 1:20 PM on January 14, 2022, law enforcement observed a male matching the description of the male captured on surveillance video cutting into containers during the January 7 Burglary as well as from physical surveillance on January 11, 2022. Law enforcement contacted and detained the male, later

identified as **PULIDO**. During BNSF PD's encounter with **PULIDO**, BNSF PD requested, in both English and Spanish, for consent to search **PULIDO**'s bookbag. **PULIDO** consented to a search of his bookbag. BNSF PD found various tools inside **PULIDO**'s bookbag, including a cordless reciprocating saw that appeared to match the saw observed on the surveillance recording of the January 7 Burglary. At the time of **PULIDO**'s detention, BNSF seized the **SUBJECT DEVICE** from his person.

19. Following his arrest, **PULIDO** was transported to BNSF PD offices for an interview.[1] **PULIDO** was advised of his rights under Miranda in both English and Spanish. **PULIDO** advised he understood his rights and agreed to speak to investigators. During **PULIDO**'s interview he admitted it was him in the still images taken from the January 7 Burglary surveillance video. He also admitted to cutting the container seals, and to opening the container doors. **PULIDO** admitted the cordless electric reciprocating saw was his and that he cut train air hoses multiple times. **PULIDO** told officers that he removed dishwashers, like those taken during the January 9 burglary, and placed them in a ditch near the train tracks.

## V. TRAINING AND EXPERIENCE REGARDING ROBBERIES AND BURGLARIES

20. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct theft, burglary, and robbery investigations, I have learned that thieves, robbers, and

[1] Present for the interview was a BNSF contract employee who served as translator from English to Spanish and Spanish to English.

burglars will use cell phones or other digital devices for some or all of the following reasons:

a. They will use website mapping programs (i.e., Google or Bing) to see the location and surrounding area of a particular target location, including information about railyards, train stop locations, and storage locations;

b. They will search online newspaper articles to read what information is available regarding the target location, including information about railyards, train schedules, effective burglary methods/techniques, and train stop locations;

c. They will search online newspaper articles or websites to view the security images of the target location, including in and around railyards;

d. They will use their phones and digital devices to:

i. Take photos or video of potential locations they considered targeting;

ii. Take photos of the stolen merchandise or proceeds from selling stolen merchandise;

iii. Take photos of trips or places they have been following a theft, robbery, or burglary -- at times showing an influx of income they normally did not have;

iv. Send written messages (e.g., via text or other messaging application) to co-conspirators, associates, or friends indicating what (criminal) activities they have been engaged in;

v. Exchange messages (e.g., via text or other messaging application) and/or photos to co-conspirators, associates, friends or other related to the sale or exchange of stolen merchandise;

vi. Use the mapping application on their phone to get directions to or from a location; and

vii. Communicate with accomplices and other co-conspirators, such as a getaway driver, via call, text, e-mail, or other messaging application.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

21. As used herein, the term "digital device" includes the **SUBJECT DEVICE.**

22. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

23. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

24. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user

places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. The person who was in possession of a device or had the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **JESUS ERIK PULIDO**'s thumb- and/or fingers on the device; and (2) hold the device in front of **JESUS ERIK PULIDO**'s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

25. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

26. For all of the reasons described above, there is probable cause to believe that **JESUS ERIK PULIDO** has committed a violation of Title 18, United States Code, Section 2117 (breaking or entering carrier facilities).

27. Further, there is probable cause that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on the **SUBJECT DEVICE**, as described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 11th day of March, 2022.

_______________________________

THE HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE